So we'll start off this morning with the first matter on today's calendar, United States v. Jalansak, I hope I'm pronouncing that correctly, 20-1540, 20-1542, and 20-2144. Mr. Kestenband. Thank you, Your Honor, may it please the Court. I'm Jeff Kestenband. I represent the appellant Hakan Jalansak. With me at council table is the attorney for the co-defendant, Eifer Jalansak, Jeremiah Donovan. Two important facts are undisputed in this case. Excuse me, before you even begin, I'm puzzled why you're here, or what dog you have in this fight. Isn't this appeal basically about whether Eifer Jalansak should have her restitution obligation deemed satisfied? It is, Your Honor. So what's your standing in this? My client derives a benefit from the fact that his co-defendant has completed her restitution obligations. Why does he get a benefit? He's still under the same obligation either way to finish. In fact, in a certain sense, if the government were able to find any assets of either of these people, but certainly of Eifer, and it satisfied some further part of the obligation from her assets, your client would be better off. So in what way does he benefit from, other than emotional satisfaction, which I guess he could get if he paid off the restitution, what does he get in a tangible way out of this appeal? When I say a benefit, I don't necessarily mean a legal benefit. He has obtained several degrees after this case ended. He's been educated at Oxford. He's received a law degree, some additional degrees, and so he's applying for jobs with the hope that by obtaining employment, and hopefully lucrative employment, he can continue to pay off his restitution balance. And it's important to him to be able to say to prospective employers that the total amount of restitution is getting paid, and it's largely due to his work to get the victims paid. I simply do not understand that, because he would be in exactly the same position. He has the same amount of restitution owed, regardless of what happens to his mother. He has the same opportunity to say, I'm the one who's doing this, to the extent either of them are doing anything, in fact, as opposed to the government collecting things or the victims collecting things through other legal processes. So I guess one of the things I'm concerned about is, here you're using half the time, and we're talking about why is he here, when the person who's got a concrete interest in this sits and has only five minutes to talk. What is the point of this? Your Honor, this was an issue that was raised tangentially below. Ultimately, it was not a basis for the district court's decision. It was Mr. Yalanchak who initiated the motion seeking restitution credit for his mother. And so, based on his interests below, as well as the arguments that he made, as I mentioned, he believes it's important for him to be able to say to people publicly that his mother's restitution has been fully paid off. Through no efforts of his. Well, that's actually not true, Your Honor. Largely, a lot of the money that was recovered through the bankruptcy proceedings was because he cooperated with the attorneys there. He sat for depositions. He did a lot of work so that the victims in this case could recover the large amount of restitution. But now he's making it more difficult for the victims to recover restitution, because now there's going to be only one person for the government to proceed against to collect more money, and that's him. And if he does not have enough assets, but if perchance, and I have no idea what the odds are, the government is able to find any resources in the accounts of Eifer Yalanchak, they're not going to be able to get that. And so the victims are, now have only one person to pursue instead of two. Why is, if he's going to say that to potential employers, it sounds like more con rather than any legitimate argument that he can make. That he's doing something good for the victims by eliminating one source of possible restitution for them. Your Honor, I see my time is up. I don't know if the court wants me to answer the question. You can answer that question. Your Honor, his mother was ordered to pay $500,000 in restitution. That fact is undisputed. It's also undisputed that the victim received the $500,000 that she was ordered to pay. But the victim was supposed to get $750,000, right? Yes. And there are two people who are in a position to pay or against whom the government can potentially obtain repayment. Him and his mother. That's true, but that's just not how joint and several liability has always been treated. Joint and several liability in tort cases where it is strictly joint and several. But here, it's not exactly joint and several liability, is it? It's not fully joint and several, that's true. Because if it were fully joint and several, then neither of these parties would have any real argument. Because the government or the victims would be allowed to pursue either of them until fully satisfied. So this is already a departure from joint and several liability to permit Ms. Yalinchak to possibly get off. Even if the victim is not fully compensated because she's at most, no matter what happens here, on the hook for $500,000. So this is not traditional joint and several liability, is it? Not as to the amount above $500,000. Not at all, not at all. The original sentence is a creature of what the discretion, what discretion the court has given to arrange restitution obligations under a statute. It is not traditional tort law, common law, joint and several liability. It's something else, is it not? The first $500,000 is traditional joint and several liability. And I would argue that the government's approach here actually leads to a bizarre result in terms of how the MVRA is interpreted. In the sense that Ms. Yalinchak, under the government's argument, is in no better position today than if she had been ordered to pay the full $750,000. No it isn't, of course that's wrong. Because if she was ordered to pay the full $750,000, she would still be on the hook even after $500,000 is paid. She will never be on the hook for $750,000. The most she can ever, under the district court's judgment, be obliged to repay is $500,000, is it not? That's true. But again, I suppose really the person who can be making that argument on her behalf is sitting over here, still not able to get up, because Mr. Yalinchak is here wasting our time on a case in which he has no concrete interest. I should probably sit down at this point. That's a good idea, Mr. Kestenbaum. So we'll hear from Mr. Donovan. My name is Jeremiah Donovan. It's really nice to be back in this court. Those of us who do criminal law have to be reminded from time to time that we are members of a learned profession. Mr. Donovan, excuse me, about being back here. We're back here with masks, and it's not always easy to hear. If you could either raise the podium or raise the microphones or speak a little more loudly. Try to raise those microphones, yes. Yeah, thank you. It's nice to be, those of us who practice criminal law have to be reminded from time to time that we are members of a learned profession. You can kind of forget that doing what we do. And my visits to the Second Circuit remind me of that. I think a lot of your questions, judges, are answered. I'm the only person here who was there for the original case. I represented IFER in the original case. It's really important to remember what happened here. Hakan sets up a company called Yasam Trading, and he scams WAM of $250,000, and IFER has nothing to do with that. Now, later on, he goes back to the trough and has a big dinner for potential investors, including WAM, and they card out IFER. And IFER is the matriarch of it. They tell her, you know, you can't speak English, so don't say anything. She's the matriarch of this rich Turkish family that's going to invest all of this money, and she just kind of sits there. But she conspires in this second part of the scam with the appropriately named Daedalus funding, and Hakan manages to separate WAM from $500,000 more. She had nothing to do with the first $250,000. It's not a situation where you were. All right, but Mr. Donovan, that's exactly why the court apportioned only $500,000 to your client. So explain to me why a judge in that sentencing can't say, since your client was only responsible for $500,000, that's your restitution obligation, not the $750,000, but it's going to be joint and several. And therefore, what that means in this context, as Dr. Lynch points out, it's a unique context. Until you personally pay $500,000 or the entire $750,000 has been paid by either of you, you're on the hook. Well, first of all, we'll talk about whether or not that's what the judge did. The first question is, legally, can the judge do that? It's called the hybrid approach. The Fifth Circuit has adopted it. Indirectly, we adopted it in Nucci in a case, it wasn't exactly on point. But is your argument that a judge cannot do that? My argument is the judge didn't do that. I mean, the judgment is kind of strange. I mean, if you look at the restitution, what we're calling the restitution order. I don't understand. The judge said, I looked at the judgment, it said joint and several liability for $500,000 out of the $750,000, right? So what else was the judge supposed to say? The judge said one of the conditions of supervised release, I mean, she didn't issue a separate restitution order. She said one of the conditions of supervised release is that IFER has to pay $500,000. It was in the judgment. And she said IFER has to pay a total of $2,250,000 to all of the victims and $500,000 to WHAM. WHAM's gotten $500,000. He has $500,000. Judge Atherton said, you pay WHAM $500,000, WHAM has gotten $500,000, that's all there is to it, Judge. No, no, WHAM still needs $250,000. Your claim is only $3,200. Not from us. She ended up not doing that. Let me give you this hypothetical. Yep. Tell me where I'm missing. Suppose there was an investment fraud, 10 individuals each defrauded $100,000, right? There's one leader of the whole fraud. So a judge says $1 million restitution for the leader. Each of the 10 of you, $100,000 of restitution. Leader dies, pays nothing. Under your reading of the law, if one of those victims and one of those defendants pays $100,000, all the other nine are off the hook because they also owed $100,000. So the victim would only get $100,000 even though there were nine people who paid zero. That's your position. Right. You're inviting me to tell you where you're wrong, and boy, it's crazy for me to tell any circuit judge that he's wrong. But that's a situation, that's a different situation. No, it's not. Let's say there are 10 scams, each involving $100,000. And the overall leader of the scam is one guy who's responsible for the whole thing. He pleads guilty to $1 million fraud involving 10 separate scams, and he has to pay $1 million. Each of the guys who's involved in each individual scam doesn't have to pay $1 million. And Eiffel doesn't have to pay $700,000. But Mr. Donovan, why do you characterize this as separate scams? Is this not the same conspiracy that they both have fled to? Take a look at the- I mean, yes, I don't know the answer I'm asking you. No, no, no, I mean, there's a single- Excuse me. I'm not trying to cross-examine you. I'm asking a question because I'd like to know the answer. I thought, and I may be wrong, and I'd like to know the answer, are they both essentially convicted of the same conspiracy? I like to be cross-examined. The judge, they plead guilty to one count. She pleads guilty to one count, and the count charges a conspiracy to commit a wire fraud. Yes. But the prosecutor, in my reply brief, I put an addendum in. You can read what the prosecutor says. The prosecutor makes very clear she had nothing to do with Yassab. She did not join the conspiracy until a certain point. Right. We have this all the time with drug dealers and such. Right. That there's a big conspiracy, and various people bump in and out at different times. Right. They're all, though, accountable for the entire conspiracy. When you set out sentencing, you may say, well, this person played a small role, so gets a little less of a sentence. That's the way these things work. So I'm not sure this is not quite the case of ten separate scams. This is the same victim. It's the same purported multimillion-dollar hedge fund that's at stake. And somebody may join the conspiracy a little later. I don't see why. And on top of all of that, the restitution award that is entered against her is apportioned. The judge could have said it's joint and several for the whole thing. Then you would have what Mr. Kestenbaum said was traditional joint and several liability. And you know what? She'd then be on the hook for $750,000. The court could have done that, could it not? No, absolutely. But it did not do that. It made her liable for, at most, $500,000. Because there were two separate scams. There was the Assam trading scam. Did the court ever make a finding that there were two separate scams, rather than that Ms. Yelvinchak made a belated entry into the same overall fraud? No, but the prosecutor in setting forth the statement of facts to which Eifer was pleading described exactly what I'm describing to you, that he set up the Assam trading, that Eifer had nothing to do with the Assam trading. He was working with this old mentor of his. They scammed Wham out of $250,000. But still, you would agree with me that under this indictment that she pled guilty to, the charge that she pled guilty to, the judge would have been entitled to make her jointly and severally liable for $750,000, right? I don't think she would have. Oh, you think that? You would have appealed that and won if the judge had done that. I mean, to use your example, if I had a relevant conduct, if I had a drug conspiracy case in which somebody joins at the very end and is responsible for the distribution, it's reasonable for Siebel to believe that he's responsible for one kilogram, and there's 400 kilograms before, and they tried to give him relevant conduct of 400, I'd appeal that, sure. So at least you think you'd have a colorable appellate issue. But let me ask you a separate question. To the extent that I understand your position, although you didn't quite, I think, respond to Judge Bianco's question about what your position is, that's okay. Is there a single decision that supports the approach that you're asking us for this position that you're asking us or inviting us to embrace? No, but I don't think there's a single position that supports the position of the government either. None of the cases that we're citing, and look, the government's done a really good job of searching for cases, and I think we have too. None of them answers this question for you at all. Well, if this is the case of first impression- It is. Should we not answer it by looking to the purposes of restitution? And the primary purpose of restitution is to see that the victim gets reimbursed. The secondary purpose, which is equally entitled to wait, is that the defendant not be obligated to pay more than her fair share. Can you tell me why either of those purposes is furthered by your approach? Because it seems to me that the government's approach, if we're to see this as a case of first impression, I'm not sure that's right. But if we are, doesn't the government's approach satisfy both? Because it means that the victim gets the greater chance. I'm a little skeptical about the chances. The victim gets the better chance to recover $750,000, and Ms. Yellenchak is never going to have to pay more than her fair share. Because if she were to pay $500,000, everything would be resolved. Right, and I suppose, as you would imagine, one of the interesting things about this appeal is I'm getting vehement about something that may not really make any difference. But, because there's a third principle. And the third principle is that the victims can't use this process in order to enrich themselves. But how will the victim ever get more than $750,000, I understand that. Because we're not responsible for $750,000, he's trying to get more than $500,000 from IFER. He is entitled to $750,000. But not from IFER, she didn't defraud, let's leave it at that. No, no, no, she's not being asked to reimburse him for $750,000. And he's not asking, or the government's not asking on his behalf, for anything more than he lost. So where is he being unjustly enriched here? Let me answer, this is obliquely answering, okay? Let's assume there's no hakan, no hakan. My lady comes in and pleads guilty, she's responsible for $500,000. If she was a solo act and she defrauded him of $500,000, that's exactly what would happen. But she's not, she's joining in a conspiracy that has been ongoing and has already built him up a certain amount of money. And now she shows up and helps the principal, her son, to get more. Right, and not just from Wham, but from a whole bunch of other people as well, that's right. And more than they told him. And she has managed to pay virtually nothing. She may have virtually nothing, I'm not blaming her. But all of the hypotheticals that you guys are advancing, which are all about people paying money and what the incentives are to pay money, in the real world, these people aren't paying money. The government is chasing them. They have no choice. Their incentives don't matter, because they have no choice. They are obliged to pay the restitution, and the government is going to chase them, as best it can with its resources, to find something, if they even have it. Well, I love this case, and I'll talk to you all day about it. But don't for a minute- I don't want you to do that. Don't for a minute minimize the extent to which Haqqan is responsible for getting a lot of this money back. It's not the government getting the money back. They haven't done anything to get the money back. It's the bankruptcy trustee. And Haqqan has cooperated hand in glove, suggesting, go sue this guy, go sue this guy. Here's some money here, here's some money that I had here. And how much of that did he actually pay? That was his money that he had control over, not the bankruptcy trustee, not the bankruptcy trustee. Right, I think my time is up, and so I'm going to have to answer. That was a rhetorical question, I'm sorry. Thank you. You each reserve a minute of rebuttal, we'll hear from the government. Ms. Cherry. Good morning, your honors, may it please the court. You might want to put those two microphones a little closer together. Sorry, hopefully that is better. My name is Heather Cherry, I'm an AUSA and I represent the government in this case. The purpose, or the primary purpose of the MVRA is to ensure that a crime victim is made whole for his losses. With that in mind, in this case, the district court properly entered a hybrid restitution scheme. If the court were to now discharge Ifer's obligation, before she fully satisfied that obligation, and before the victim was made whole, the victim's rights to full and timely restitution would be violated, and the discharge would undermine the purpose of joint and several liability. I just want to make one point because my colleagues kept on referencing the fact that the victims received, or the victim in this case received $500,000. And just to make it clear for the record, that the restitution owed, that was credited $500,000. The victim has not received $500,000 from the bankruptcy, that was what the last case was about. So, not only has the victim not been made whole, but really will probably never made whole. Not because we can't- What does that mean, credited, in the context of restitution? In the context of restitution? What does the government do with that credit? Why isn't it going to the victim? Well, that's essentially the previous- A retroactive credit, is that what it is? It's the previous litigation. What happened was, there was a bankruptcy, and some assets were received through that bankruptcy. The short of it is, you're going to say that the district court made a mistake in crediting it. The government made a mistake in not opposing or appealing, so that the restitution account was over-credited. But it turned out, after the fact, on Mr. Yalinchak's last appeal, where he wasn't so much being eager to make sure that the victim got the maximum credit- maximum restitution, but was trying to make sure that he had the maximum credit, Mr. Yalinchak appealed and successfully argued that the first erroneous restitution order was a final order that could have been appealed by the government and wasn't. And therefore, it was too late to go back and get it. So that's the thing you're revisiting here. And I wonder if your primary purpose doesn't seem to be to make sure that the- your adversaries get a chance to use their one minute in rebuttal, rather than resting on your brief? And not giving them more to shoot at? I certainly can rest on my brief, Your Honor. If there are no questions, I would just ask that the court reject Eifert's arguments and affirm the ruling entered by the district court. Thank you. Hey, Mr. Casaban, you heard the government's presentation? I'm sensitive to the issues that were raised the first time, so I want to try to be as brief as I can. First, to address Judge Lohay's question about is there any case law, and I would argue there actually is case law that supports this. It's the Gonzales case that's cited in her reply brief. It's attached in the addendum that all the material facts are identical to what we claim should happen here. The government there relied on sheets, and the court that decided Gonzales was a district court case, obviously not binding here. But that court did not read sheets the way the government would ask this court and decided the case exactly the way the defendants are asking, Your Honors, to decide it. The only other point I would make is that the approach that we've advocated for is easy to apply and it's workable for each dollar that's paid. Each defendant gets credit for that dollar. The government's approach creates problems in a situation where the restitution does come from a third party, for example. The problem is the make whole principle of the MVRA. So there are too many circumstances under which if we embrace your approach, the victim is not made whole. Help me fix that problem with your approach. Well, the victim is made whole for the amount that IFA owes here. No, no, no, no, no, no, no, no. Help me fix the problem that I just identified, $750,000 under your approach. There are too many circumstances under which the victim cannot be made whole. So help me understand how your approach fixes that problem and fills those gaps. Right, well, it's not unusual for victims not to receive all the restitution that they're- No, I'm just saying that. I'm sorry? Structurally, help me understand how your approach can maximize the chance of a victim getting whole. For example, our approach incentivizes defendants, and I understand Judge Lynch doesn't believe that, but this case does provide a perfect example of Haqqan affirmatively and proactively doing everything he could to get the victims made whole. I have another case that's obviously outside this record, a defendant who recently got sentenced and it was about 50,000 restitution. She's working hard at Dunkin' Donuts to try to get that taken care of as soon as possible. So there are- The problem is that not only is the victim not made whole, there's a windfall to the defendant who is responsible for 500,000 but only paid 3,200. So you have a victim who's not whole and you're a defendant who was involved in a $500,000 fraud and only paid $3,200. So it's a combination of two things, both of which are contrary to the Restitution Act. I know I've gone over my time. I guess what I would answer briefly, Your Honor, is that I agree with what the court's premise is, but that's what joint and several liability is about. Someone can, if it was a traditional joint and several liability where they were each ordered to pay, let's say, 500,000 and Haqqan paid all of it, then IFER would be off the hook. Traditional, of course, if he paid all of it, which he hasn't done, maybe he can't do, I'm not blaming him. But in traditional joint and several liability, actually what mostly is going to happen in the benefit of joint and several liability is that a plaintiff who has a judgment can pursue the richer person and succeed in getting all the money from the person who can afford to pay it. And then it falls to that defendant, if he or she chooses, to seek contribution and pursue the other party. But the victim gets the choice of whom to go against. What you're doing is quite different than that. What you're asking us to do is quite different than that. It's saying that the government will be precluded from going against who, for all we know, is the richer party. It could be anything out there. Either of these people could have no money or hidden money or whatever. And the government and the victims are being deprived of targeting one person for the joint and several liability because of what the other one does. And all of your incentivizing arguments apply only in the case where, among the thieves, there is conspicuous honor and conspicuous affection by one party. That is not the typical case, to say the least. Usually, we wouldn't have one defendant showing up and urging that we credit the other defendant with money so that the likelihood that that defendant, the defendant I'm talking about, would be forced to pay more in the end, assuming he has it and the government can find it. I mean, suppose, for example, in this family, Ms. Yalinchak, who, after all, has posed at times as being from a very wealthy family, really were, and there were assets somewhere under her control. Then your client, in fact, would benefit, if there was no money that was obviously and provably under his control, from getting the family resources not taxed against his mother. You know, there are all kinds of situations we could conjure in which somebody gets some kind of incentive. But I keep coming back to there are two principles that animate this whole statutory scheme. Make the victim whole, limit a culprit who was not really responsible for the whole loss to not have to pay more than she is responsible for. And as I asked Mr. Donovan, and he didn't answer me, which of those principles is furthered by the approach that you want? Because it looks to me as if your approach frustrates potentially both of those purposes. Well, we've argued that our approach does not frustrate and actually incentivizes defendants to make restitution. And I would actually point, Your Honor, to the language in the first Yalinchak appeal that Your Honor wrote, which is that defendants with restitution orders are entitled to know, as they make their way through their lives and make economic decisions, how much they will be required to pay. Exactly. And Ms. Yalinchak knows exactly the maximum that she will be required to pay is $500,000. As I understand it, as of today, the maximum that she would be obliged to pay is only $150,000 or less, because that's how much remains of the $750,000 to be paid off. She knows exactly what her liability is, except for the possibility that maybe she'll get another windfall and Haqqan will come up with more money and she won't have to pay anything. The reason I disagree that Eifer knows is because when the restitution order was entered in 2007, her expectation, as I believe it was the government's expectation then as well, was that each dollar credit, each dollar paid would be credited towards both of their restitution balances. Judge Arnetton never made clear that the restitution payment should be applied. Well, the judge in Broadbent made clear, for God knows what reason, that the award was being structured exactly as you suggested, but that judge made it clear in the judgment that that's what was required. I don't know why, but that's what the judge stated, and that was enforced by a court of appeals. But it seems to me, if there's some ambiguity here, clearly the rational approach is to favor the government, because once again, Ms. Jalinchak knows from day one that she can never be made to pay more than $500,000. And she also knows that if the government is not able to recover anything from her son, but can find something against her, that she might have to pay that, and it might be $1.98 or it might be $500,000 or it will never be more. So I don't understand what's this great uncertainty. Because when the court says she knew from day one, lawyers advise clients when it comes to joint and several liability that if your co-defendant pays a dollar, you don't have to pay that dollar. If the district court wanted to make it clear, it could have done what it did in broadband, to say this is how it will be allocated. But absent that, if there is an ambiguity, that ambiguity should inure to the benefit of the defendants, not to the government. And so to the extent, I agree, there probably is an ambiguity here, because we've always understood joint and several liability to be $1 paid, gets applied to all the defendants, that ambiguity should benefit the defendants. All right. We'll hear from Mr. Donovan on rebuttal. I used up so much time during the course of my initial argument, and I'm grateful for it, and I've got a minute here. And I just say that you're missing one other principle, and that is that the defendant shouldn't have to, that there's a limit on the amount that the defendant has to pay. This seems to us to be a simple case. How does that limit exceed here? She's got to pay $500,000. There are 500,000 in credits. She's paid off. That's all we say. We've got your arguments squarely in mind. We'll reserve decision. We'll hear argument next.